STATE OF MONTANA, ex rel. WILLIS B. JONES, Relator and Respondent, v. STATE BOARD OF LAND COMMISSIONERS, et al., Defendants and Appellants.

STATE OF MONTANA, ex rel. FORD JOHNSON, Relator and Plaintiff in Intervention and Respondent, v. STATE BOARD OF LAND COMMISSIONERS, et al., supra, Defedants and Appellants.

No. 9340.
Submitted January 14, 1954. Decided December 10, 1954.
279 Pac. (2d) 393.

Mr. Arnold H. Olsen, Atty. Gen., Mr. William F. Crowley, Asst. Atty. Gen., argued orally for appellants.

Mr. Willis B. Jones, Billings, pro se.

Mr. Wesley W. Wertz, Helena argued orally for Jones.

Mr. Ralph J. Anderson, Mr. Myles J. Thomas, Helena, argued orally for Ford Johnson.

Mr. Sam C. Ford, Helena, argued orally for J. Hugo Aronson.

Mr. Otto T. Habedank, Sidney, Mr. Randall Swanberg, Great Falls, Mr. John M. Schiltz & Mr. John C. Sheehy, Messrs. Coleman, Jameson & Lamey, Mr. Howard M. Gullickson, Billings, Mr. LaRue Smith, Jr., Great Falls, Mr. John L. Cravens, Billings, amici curiae.

MR. JUSTICE FREEBOURN:

Willis B. Jones, relator and respondent, brought this action in the district court of Lewis and Clark County, seeking a writ to prevent the Montana state board of land commissioners and its individual members, defendants and respondents, "from conducting any sale or receiving any bids upon any lease for oil and gas upon any school trust lands upon any terms other than those prescribed and established by the legislature of the State of Montana in Chapter 122, Montana Session Laws, 1953."

Ford Johnson, relator and respondent, filed a complaint in intervention, asking the same relief as Jones, and praying that

the state board of land commissioners be restrained ''from issuing oil and gas leases on such public school lands in accordance with and pursuant to the provisions of section 81-1702, Revised Codes of Montana 1947, as that section stood prior to its amendment by said section 1, Chapter 122, Laws of Montana 1953.''

Demurrers of the land board to the complaint and complaint in intervention were, by the district court, overruled, and counsel for the land board elected to stand upon such demurrers and elected ''to file no further pleading in said cause and said defendants waive time to further plead in said cause.''

The district court thereupon, on July 31, 1953, entered its judgment whereby the land board was ''permanently enjoined and restrained from conducting any sale or receiving any bids upon any lease for the production of oil and gas upon any school trust lands of the State of Montana granted to it by the Enabling Act, 25 Stat. 676, upon any terms other than those prescribed and established by section 1 of Chapter 122 of the Laws of Montana of 1953.''

The defendant land board appealed from such judgment.

Prior to 1921, when Congress assumed to amend the Enabling Act, 42 Stat. 158, state lands could be leased ''for periods of not more than five years.'' Section 11.

The legislature of this state by the enactment of Chapter 108, Laws of 1927, and assuming to act pursuant to the above 1921 amendment of Congress, undertook to extend such period of leasing to not more than 20 years. See Texas Pacific Coal & Oil Co. v. State, 125 Mont. 258, 234 Pac. (2d) 452.

The Enabling Act, section 11, prior to 1948, provided that leases for the extraction of oil and gas on state lands should be for a specified term of years.

Such section, in part, provided that:

''*The said lands may be leased under such regulations as the legislature may prescribe;* but leases for grazing and agricultural purposes shall not be for a term longer than ten years; mineral leases, including *leases for exploration for oil and gas and the extraction thereof, for a term not longer than twenty years;*

and leases for development of hydroelectric power for a term not longer than fifty years." 47 Stat. 150, as amended by 52 Stat. 1198. (Emphasis supplied.)

In 1948, the Congress of the United States assumed to amend section 11 of the Enabling Act, Public Law 480—80th Congress, Ch. 183, 62 Stat. 170, pursuant to a joint memorial of the 1947 Montana legislature, so as to provide:

"Except as otherwise provided herein, the said lands may be leased under such regulations as the legislature may prescribe. Leases for the production of minerals, including *leases* for exploration *for oil, gas* and other hydrocarbons *and the extraction thereof, shall be for such term of years* and on such conditions as may be from time to time provided by the legislatures of the respective States; leases for grazing and agricultural purposes shall be for a term not longer than ten years; and leases for development of hydroelectric power shall be for a term not longer than fifty years." Public Law 480—80th Congress, Ch. 183, 62 Stat. 170.

The 1949 Montana legislature, by Chapter 18, Laws of 1949, page 29, assumed to accept the above amendment by the Congress.

The 1953 Montana legislature then undertook to amend R. C. M. 1947, sec. 81-1702, by the enactment of Chapter 122, Laws of 1953, page 220, in conformity with the above attempted congressional amendment.

Prior to such amendment by Chapter 122, section 81-1702 provided:

"(2) All leases issued hereunder shall be granted for a period not exceeding ten (10) years and *as long thereafter during the term of twenty (20) years* commencing with the date of such lease or leases * * *."

After the enactment of Chapter 122, section 81-1702, as amended, read:

"(2) All leases issued hereunder shall be granted for a primary term or period of ten (10) years, and *as long thereafter as oil or gas in paying quantities shall be produced thereunder * * *."

It can be seen from a reading of section 81-1702, as it was before and after the purported amendment by Chapter 122, that the life of an oil and gas lease of "twenty (20) years," a definite and specified "term of years," became, under the purported amendment, "as long thereafter as oil and gas in paying quantities shall be produced," which was not a "term of years," but an uncertain period of time, dependent upon the life of the particular oil or gas well produced on any given lease.

Oil and gas leases issued under section 81-1702, as attempted to be amended by Chapter 122, are contrary to and in direct conflict with section 11 of the Enabling Act, and contrary to its specific direction that such lease "shall be for such term of years" as provided by the legislature.

For the reasons stated the judgment of the district court is reversed, with directions to such court to sustain the demurrers to said complaint and complaint in intervention, to dismiss such complaint and complaint in intervention, and to dissolve its order whereby the defendants and appellants have been prevented from selling or receiving bids upon any oil or gas lease for the production of oil and gas upon state school lands under R. C. M. 1947, sec. 81-1702, as it stood prior to its amendment by Chapter 122, Laws of 1953. Remittitur will issue forthwith.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICE BOTTOMLY, concur.

MR. JUSTICE BOTTOMLY: (specially concurring).

I concur in the foregoing majority opinion. However, I wish to state that there is another serious question presented by this appeal.

The question is whether our legislature or our Congress may effectively and lawfully change the terms of the Enabling Act, without the consent of the majority of the electors of Montana at a duly proclaimed election held for that purpose.

The ordinances which were directly submitted to the people for their ratification at the polls as well as our Constitution are

the fundamental law of this state. See State ex rel. Thompson v. Kenney, 9 Mont. 223, 236, 23 Pac. 733; 16 C. J. S., Constitutional Law, sec. 11, page 47.

Ordinance No. I, which, together with the Constitution of the state, was ordained and promulgated by the Constitutional Convention and adopted by the people at a duly proclaimed election, provides in section Sixth that "the ordinances in this article shall be irrevocable without the consent of the United States and *the people of said state of Montana.*" (Emphasis supplied.)

Section Seventh, Ordinance I, provides: "The state hereby accepts the several grants of land from the United States to the state of Montana, mentioned in an act of congress, entitled 'An act to provide for the division of Dakota into two states, and to enable the people of North Dakota, South Dakota, Montana and Washington, to form constitutions and state governments, and to be admitted into the Union on an equal footing with the original states, and to make donations of public lands to such states.' Approved February 22, 1889, upon the terms and conditions therein provided."

This Ordinance, so duly approved by the electors of Montana, grants designated lands to the State of Montana which lands were accepted according to the condition and terms set forth and specified in the Enabling Act as follows:

"Sec. 10.  That upon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed states, and where such section, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said States for the support of common schools, such indemnity lands to be selected within said States in such manner as the legislature may provide, with the approval of the Secretary of the Interior; Provided, That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time,

be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.

"Sec. 11. That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than ten dollars per acre, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislatures shall prescribe, be leased for periods of not more than five years, in quantities not exceeding one section to any one person or company; and such lands shall not be subject to pre-emption, homestead entry or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only." 25 Stat. 679.

Sections 10 and 11, supra, of the enabling Act, together with our Ordinances and Constitution constitute the contract so approved by the people of Montana voting thereon and accepted by our Federal Government. Under the terms of our Ordinances and Constitution these terms may not be altered or varied without the consent of both the United States and the people of Montana. The requisite consent of the people has never been given or expressed. In fact such question has never as yet been submitted to the vote of the people of this state as is required, hence the proposed changes and amendments have never become effective.

The real parties in interest in the lands granted are the present and future taxpayers and the present and future generations of school children of Montana.

Under the original grant by our Federal Government to Montana and the provisions of our Ordinances and Constitution, the taxpayers and all electors of Montana are to be consulted whenever the Enabling Act is to be changed in any manner that will materially affect their interest.

Where is the law or equity in permitting or allowing the Congressmen from Maine to California, from Florida to Washington, in fact the Senators and Congressmen from all the states of the Union, to pass upon and decide a change in or amendment to the fundamental laws of this state which primarily and directly affect and concern only the people of Montana and which cannot become effective without the approval of the electors of Montana?

Of course it is fundamental that such an amendment and Act of Congress would have no force or effect until and unless it is first approved by the people of Montana upon a duly proclaimed election where the measure is properly submitted to them for their ballot. This is a right, power and matter which the people of Montana reserved and retained in themselves to pass upon; it was a compact between the people of Montana and their Federal Government, and was a power and right reserved to themselves and not delegated to their legislative representatives.

The Enabling Act and Ordinances as a part of our fundamental law and the Constitution were first submitted to and approved by the people of Montana and thereafter the Ordinances and our Constitution were submitted to and approved by our Federal Government, and the whole thereof became a binding and sacred written agreement and contract between the citizens of Montana and our Federal Government.

One of the important terms and conditions of that covenant was that the Ordinances shall be *irrevocable without the consent* of each of the parties thereto, the United States *and the people of the State of Montana*. Not the United States and the state legislature, but the United States and the people of Montana. At that time, the first Tuesday in October 1889, the people, the electors, of Montana, well knew what the expression, "the people of said State of Montana," meant and that is what they approved by their votes. If at that time it had been advisable, or it had been the intention of the people to delegate this power to their legislature, it could have been so stated.

An Ordinance framed and adopted by the Constitutional Con-

vention and appended to the Constitution and with it submitted to and adopted by the people of Montana, has the same force and effect as a constitutional provision and the effect of such an Ordinance upon any Act or statute passed by the legislature, in conflict therewith, is to modify, change or annul the same as far as necessary to give the provisions of the Ordinance full scope, force and effect. See State ex rel. Thompson v. Kenney, supra; 16 C. J. S., Constitutional Law, sec. 11, page 47.

This right and power which the people reserved to themselves they may impart as much or as little of as they shall deem expedient. The people's welfare under our Ordinances and Constitution does not rest upon the transient circumstances of the hour, nor the accidental character of the majority of the legislature at any particular time.

Under the fundamental law of our state here in question, the legislature may not seek to bind the people of Montana without their ratification.

We are dealing here with the supreme law of our state; it is the people's voice, expressed by their vote; it is their own appointed mode through which they govern all of the people and their agents, representatives and officers. Neither the courts nor the legislature may transgress upon the expressed, enacted, basic laws of the people themselves. Such provisions are mandatory and conclusive. Constitution of Montana, Art. III, sec. 29; In re Weston, 28 Mont. 207, 212, 72 Pac. 512.

The attempt by courts or by legislation to whittle away the provisions of our Ordinances and part of our Constitution is a dangerous practice — foreboding the final crumbling of our whole structure and form of government.

"All political power is vested in and derived from the people; all government of right originates with the people; is founded upon their will only, and is instituted solely for the good of the whole." Constitution of Montana, Art. III, sec. 1.

Section 30 of Article III declares that, "The enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people."

It is true the legislature may speak on subjects, questions and matters which are not reserved to the people, but on all reserved matters only the people themselvs may speak. The legislature may submit a measure to the people for their approval, and may order a special election thereon. This is all that is necessary for a lawful and constitutional disposition of this question.

It has been argued that such an interpretation and holding would be contrary to long practice and concurrence by the administrative officers and agents, legislative Acts and the decisions of this court. Noting all of this argument, it can be answered by stating that the basic question here raised was not pressed nor briefed in any of those decisions.

It is also argued that chaos would result by such a holding. The writer is convinced that under the law and rules of equity no great harm if any would result from such a holding, as parties to contracts heretofore entered into in reliance on legislation and any court decision would in no way be affected and such matters would be determined in accordance with the well established rules of equity set forth in the following cases. Gelpcke v. City of Dubuque, 68 U. S. 175, 17 L. Ed. 520; Havemeyer v. Iowa County, 70 U. S. 294, 18 L. Ed. 38; Douglass v. Pike County, 101 U. S. 677, 25 L. Ed. 968; Township of New Buffalo v. Cambria Iron Co., 105 U. S. 73, 26 L. Ed. 1024; City of Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 20 S. Ct. 736, 44 L. Ed. 866; Tidal Oil Co. v. Flanagan, 263 U. S. 444, 44 S. Ct. 197, 68 L. Ed. 382; Levin v. Baltimore & O. R. Co., 179 Md. 125, 17 Atlantic (2d) 101; Hoven v. McCarty Bros. Co., 163 Minn. 339, 204 N. W. 29; 97 A. L. R., note 11, page 516; 15 McQuillin, Municipal Corporations, sec. 41.11, page 324.

For the foregoing reasons in addition to those set forth in the majority opinion I would hold that Chapter 122, Laws of 1953, is unconstitutional, the injunction vacated and the complaint dismissed.

472

MR. JUSTICE ANDERSON: (dissenting).

The two foregoing opinions are contradictory of each other and it is my view that one cannot agree to both of them.

I am convinced that under the circumstances no one, the oil industry, the legislature, or the land board, will be able to determine any future course under said opinions and for that reason I deem it well to express my own views regarding the status of past, present and future oil and gas leases of federal land grants.

I think the land board of the state of Montana should be prevented from making oil and gas leases under the provisions of Chapter 122, Laws of 1953, and to this extent, but not for the same reasons, I agree with the majority opinions.

The present litigation arose out of an effort by the state land board to ignore the provisions of Chapter 122, Laws of 1953, and its attempt to enter into state oil and gas leases under a previous law having to do with the same subject matter. Such a practice is indeed unique and little if any precedent exists for it.

Ordinarily it is the duty and the function of the attorney general and a state board to uphold and carry out the legislative directive. Here in effect the attorney general and the board attempted by their action to veto a legislative Act which power so far as I can determine is and always has been unauthorized in constitutional government.

It would seem to me that this court extends itself too far when it impliedly gives the attorney general and a state board such power. The same power may well carry on down to all state, county and city officers whose duty it is to enforce the laws. Subscribing to such a theory is in my opinion unwise.

I think a state board or the attorney general may, by proper proceedings, where a grave legal question is presented, see to it that the statute is questioned. But here the procedure seemingly set into motion was to by-pass a judicial determination of Chapter 122, Laws of 1953, and such apparently would have been accomplished if no outside party had intervened.

Inasmuch as this court and the court below have passed upon the questions presented, my reactions to them follow:

The issue resolved itself in favor of the relator in the court below. The lower court's view favored the expression of the 1953 legislature found in Chapter 122, Laws of 1953.

In the instant cause the attorney general originally advanced a great number of theories in support of appellants' position. However, upon argument, he abandoned all of the appellants' theories save one, i. e., under the terms of Chapter 122, Laws of 1953, the state will not be able to command the full market value for the disposal of its interest in oil and gas properties as said full market value is provided for by Article XVII, sec. 1, Montana Constitution.

The discussions found in the briefs of the appellants and in an opinion of the attorney general to the effect that Chapter 122 violates the Federal Enabling Act, in respect to the full market value, was not referred to at the time of argument. See Atty. Gen. Opinions, No. 13, Vol. 25.

Apparently the majority of this court, during the delay in rendering its opinion, has forgotten the position taken by the land board at the time of argument and now chooses to bottom it findings upon the interpretation of the amendment to the Federal Enabling Act.

Although the majority of the court is adroit in avoiding the several questions presented by all parties to the issue I nonetheless intend to cover most of the points involved.

The questions regarding the intent and the right to adopt the amendment to the Enabling Act are covered well by the dissenting opinion of Mr. Justice Angstman. My only comment in this respect is that if the records before the Congress meant anything at all, which I think they do, the majority of the court necessarily disregarded said records in order to conclude what it did.

*In any event, the language having to do with the federal lands found in the Montana Constitution, for the most part, was obviously borrowed from the language in the Enabling Act and if it can be said the Constitution is violated, necessarily it may usually*

*be said that the Federal Enabling Act is also violated.*

This business of segregating the state question from the federal question regarding federal land grants for the disposition of state lands or interests therein causes strange results to follow, as I will presently point out.

In his argument the attorney general alludes to the provisions of R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951, code 61, which law, for all practical purposes, puts a ceiling of 12½ per cent as the royalty that the State of Montana, acting through its land board, can exact under leases of state oil and gas properties.

The appellants pointed out at the time of argument that the full market value cannot be obtained under Chapter 122, Laws of 1953, when R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951, puts a fixed ceiling upon royalties on oil produced in quantities of less than 3,000 barrels per month per well to be exacted by this state. However, to carry out the appellants' argument in this respect to the ultimate by stating that R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951, makes it impossible, in view of the 1953 law here directly in question, to obtain the "full market value" for oil and gas leases, would not be changed in the least if the State of Montana were to use any former leasing Act as appellants contend it should.

In State ex rel. Dickgraber v. Sheridan, 126 Mont. 447, 254 Pac. (2d) 390, this court held that the so-called bonus for oil and gas leases is income or rental as distinguished from a disposition of a part of the corpus of the estate itself and thus capital in nature.

Quoting from the majority opinion in the Dickgraber case regarding respondent's contentions, this court made the following findings: "That the oil and gas leases issued on school lands are not leases; that the transactions evidenced by written instruments labeled 'State of Montana Oil and Gas Lease' are not lease transactions at all but that, in legal effect such transactions are sales; that any cash moneys paid out of pocket by the successful bidder for a state oil and gas lease that is in excess of the

stautory minimum of 75¢ per acre are no part of the 'annual rental' on the lease \* \* \* but all such moneys \* \* \* are either (1) 'royalty,' (2) 'bonus' or (3) 'the proceeds from the sale and other permanent disposition' of the particular school lands described in the lease. *We find no merit in any of the above contentions so made.*" (Emphasis mine.)

It seems wanting to me in view of the fact that the state land board apparently shared the views of the majority of this court in the Dickgraber case, that it did not pursue a course to prevent leases under the provisions of R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951.

Without the ruling in the Dickgraber case it is at least conceivable that R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951, might not fall within the inhibitions found in the Enabling Act and the Constitution and full market value for oil and gas leases may be obtained, but with that ruling it is obvious that section 81-1704, as amended, is of itself a violation of both the Enabling Act and the Constitution and as such provides the oil and gas industry with an advantage it was never intended to have.

I did not agree with the ruling in the Dickgraber case when it was made, and I do not agree with it now; nonetheless it is the law of this state and remains such unless expressly overruled.

Either this court was wrong in its intepretation of the applicable provisions of the Enabling Act and the Constitution in the Dickgraber case, or R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951, clearly violates the Enabling Act and the Constitution of Montana, and whether the state leases its land under the 1953 amendment, supra, or under any former Act will not in any way change the results stemming from the ruling in the Dickgraber case. This statement begs the question, why is that so.

Referring to the above quoted language from the Dickgraber case, the so-called bonus is not for a permanent disposition of the particular land itself or any part thereof but is income in the nature of mere rent.

Had this court in the Dickgraber case determined, as Mr. Justice Angstman and I did, that the so-called "bonus" was paid for the right to impair and diminish the fee, then it is conceivable at least that R. C. M. 1947, sec. 81-1704, as amended, could meet the requirements of the Enabling Act and the Constitution having to do with full market value, but with its ruling the court precludes such a result.

The legislature may have had in mind the uncertainty of oil and gas explorations, thus may have intended that the State of Montana exact a part of the market value for the right to diminish the fee at the time the lease is granted and the other part of the market value to be exacted in the nature of a fixed royalty if oil and gas are produced. By such an equation the state may thus receive for itself the best possible return for its oil and gas interests. The legislature, recognizing, and it being a known fact, that a great number of oil and gas prospects prove to be nonproducers, full market value thus is placed upon the exploration itself on the theory of diminution regardless of discovery. The reserved fixed royalty conceivably would be sufficient for the complete assurance to the state of full market value for the whole thereof if discovery follows. The purpose of such an equation may, at least, encourage greater prospecting over a widespread area, all of which may result in the best ultimate benefit to the state. See Bulletin, American Association of Petroleum Geologists, Vol. 37, No. 6, Table III, page 1193.

Under such circumstances the state may have made its best bargain assuring to itself the full market value as is contemplated by the Enabling Act and the Constitution of this state.

Such a formula produces some logic to satisfy the ends sought by the Enabling Act and the Constitution regarding "full market value" but when the land board of the State of Montana, by statute, is limited to a fixed "royalty" and no more for gas and oil leases, no logic is convincing which would establish the fact that "full market value" can be obtained from a state land oil and gas venture.

This brings the state, as I see it, into the peculiar dilemma

which is as follows: In the event the court was wrong in the Dick-graber case, and I think it was, the "permanent school fund" is entitled to be paid, by the people of this state, the amount erroneously paid out as income funds by reason of the Dickgraber case. (This is not a new experience in Montana.) If this court was right in the Dickgraber case, the leases entered into under R. C. M. 1947, sec. 81-1704, as amended by the Laws of 1951, are void (because a royalty fixed is not market value) and must be cancelled forthwith and the money paid to the State of Montana for such leases must be returned to the lessees. State ex rel. Boorman v. State Board of Land Commissioners, 109 Mont. 127, 94 Pac. (2d) 201.

It appeared advisable to me when the Dickgraber decision was rendered that the questions there involved should have been decided upon both the state and federal questions involved and submitted to the United States Supreme Court for its determination because all of the state Acts and constitutional provisions applicable thereto find a source and thus the basis of authority in the Federal Enabling Act.

The confusion which is now apparent leaves the State of Montana and the oil industry in an undesirable quandry as to what should be done with state leases already in existence and state oil and gas lands which may in the future be leased.

I believe that the state land board cannot make leases under the terms of Chapter 122, Laws of 1953, but I believe with equal vehemence that, as the entire leasing laws of Montana now stand and in view of the ruling in the Dickgraber case, supra, no substitute Act may be used in making oil and gas leases as is attempted by the appellants, without running clearly into the inhibitions found in the Federal Enabling Act and the Constitution of Montana.

Although R. C. M. 1947, sec. 81-1704, as amended, was not squarely presented in the proceedings below it was brought to our attention by argument and I think it proper to point out its effect upon other existing statutes and decisions.

The validity of the 1953 laws was challenged by the state land

board upon the theory that a prior Act having to do with the same subject is valid and thus can be used in making state oil and gas leases. Under the circumstances, the results which follow, if leases are made under a prior law, are questions, the answer to which, this or any other court should give.

No one part of the leasing law of the State of Montana should be torn loose from the rest of the law for the purpose of a determination of its constitutionality, when as is shown, chaos from such a practice may or does result.

Until and unless the differences herein pointed out are set at rest by this court or by higher authority, it is my opinion that the state land board is powerless to make any oil and gas leases with anybody under any existing law now appearing in the Codes of this state.

By reason of the confusion present in the opinions herein rendered, I do not agree that a remittitur should issue forthwith and in this respect Mr. Justice Angstman assures me that he agrees.

MR. JUSTICE ANGSTMAN: (dissenting).

Months ago and during the 11 months' period of gestation which produced the opinions prepared by Mr. Justice Freebourn and Mr. Justice Bottomly (the case having been argued to this court in January 1954), I wrote my views on all the contentions made by the attorney general.

While the opinion of Mr. Justice Freebourn is based upon but a single point I shall state my views on each point raised by the attorney general.

As stated in the opinion of Mr. Justice Freebourn, relator brought this proceeding to enjoin the defendants from conducting any sales or receiving any bids upon leases for oil and gas upon any school trust lands upon terms other than those prescribed by Chapter 122, Laws of 1953. The petition alleges in substance that the attorney general has held Chapter 122 to be unconstitutional and that the defendant board in consequence threatens to, and unless restrained from so doing, will present

for competitive bidding certain school lands for oil and gas leases on forms used prior to the passage of Chapter 122, Laws of 1953. Ford Johnson was permitted by the court to intervene in the case. He takes the same view of the law as does relator.

Demurrers were filed to the petition of relator and to the complaint in intervention which were overruled by the court. Defendants elected not to plead further. Judgment was accordingly entered in favor of relator and in favor of plaintiff in intervention for the relief demanded by them. Defendants have appealed from the judgment.

There are two principal questions presented by the appeal. First, does Chapter 122, Laws of 1953, violate the Enabling Act, and second, does it violate the state Constitution? The district court answered both questions in the negative.

Chapter 122 authorizes leases "for a primary term or period of ten (10) years, and as long thereafter as oil or gas in paying quantities shall be produced thereunder."

Section 11 of the Enabling Act was amended by Congress in 1948, 62 Stat. 170, to read as follows: "* * * Leases for the production of minerals, including leases for exploration for oil, gas, and other hydrocarbons and the extraction thereof, shall be for such term of years and on such conditions as may be from time to time provided by the legislatures of the respective States * * *." This was done upon request of the Montana legislature contained in Senate Joint Memorial No. 7, 1947 Session Laws, page 811. It was accepted by the Montana legislature in 1949, Ch. 18, Laws of 1949.

The attorney general contends that a lease in the form prescribed by Chapter 122 is not authorized by the amended Enabling Act. His contention is that the lease authorized by Chapter 122 is not for a term of years as provided in the amended Enabling Act.

The complaint in intervention contains the history of the amendment in the Congress of the United States and a copy of the report of a legislative committee of the House wherein is contained an explanation of the bill, which among other things

states: "The purpose of this bill, as amended, is to amend the enabling act of the States of North Dakota, South Dakota, Montana, and Washington, whereby these States will be permitted to make leases for the life of the well on oil-bearing property rather than for a limited period of time, as is required by the present law."

To the committee report was attached a statement by the Department of the Interior approving the proposed amendment in which it was stated, among other things, as follows: "The general practice as to public lands at present is to issue oil and gas leases for a definite term and so long thereafter as oil and gas are produced. I know of no reason which would militate against extending authority to the State to do likewise with respect to its school lands."

It has long been the rule that in construing a constitutional provision (and the same rule would apply to the Enabling Act), the proceedings and debates of the framers and the history of the measure may be examined as tending to show what its terms were understood to mean. State v. Camp Sing, 18 Mont. 128, 44 Pac. 516, 32 L. R. A. 635; Murray Hospital v. Angrove, 92 Mont. 101, 10 Pac. (2d) 577; Nichols v. School District No. 3, 87 Mont. 181, 287 Pac. 624; State ex rel. Federal Land Bank v. Hays, 86 Mont. 58, 282 Pac. 32; State ex rel. Vickers v. Board of County Com'rs, 77 Mont. 316, 250 Pac. 606. The same rule prevails in the United States Supreme Court. United States v. Flores, 289 U. S. 137, 53 S. Ct. 580, 77 L. Ed. 1086; McFeely v. Commissioner of Internal Revenue, 296 U. S. 102, 56 S. Ct. 54, 80 L. Ed. 83; McLean v. United States, 226 U. S. 374, 33 S. Ct. 122, 57 L. Ed. 260; Church of Holy Trinity v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226.

If there were any doubt about the meaning of section 11 as amended, and particularly as to whether it authorized a lease for as long as oil or gas is produced on the land, that doubt is completely dispelled by the legislative committee report as to the purpose of the Act under consideration. That report clearly shows the purpose to be to authorize leases "for the life of the

well rather than for a limited period of time.'' I think Chapter 122 is in harmony with amended section 11 of the Enabling Act.

But the attorney general contends that amended section 11 never was properly accepted by the State of Montana. He points out that when the state accepted the grants of land by the seventh section of Ordinance No. I of the Constitution of Montana, it also adopted the sixth section reading, ''That the ordinances in this article shall be irrevocable without the consent of the United States and the people of said state of Montana.'' He contends that the people of Montana never consented to the amendment by congress of section 11 of the Enabling Act.

This question is not properly presented in this procedure. The complaint in this action alleges that defendants are threatening to receive bids on school lands for oil and gas leases on forms used prior to those prescribed by Chapter 122.

Section 11 of the Enabling Act has been amended several times before the one made in 1948 and the amendment in each instance was accepted by the Montana legislature and not by a vote of the people of Montana. It follows that if the attorney general's contention that a vote of the people be necessary, then all leases made under the law under which he proposes to operate would likewise be invalid. In other words, his contention, if sustained, would not justify a lease in the form which he advises and which defendants threaten to issue. The consent of the people of Montana under Ordinance I, sec. 6, of the Constitution is properly expressed by the legislature of Montana. That a vote of the people was not contemplated is quite plain from the ordinances themselves. Thus by section 2, the Convention itself expressed the agreement of the people of Montana without an election, and section 6 of Ordinance I simply means that the people of Montana may give their consent through their duly elected representatives just as the consent of the United States is given through Congress. But it is certain that if leases cannot be granted under Chapter 122 for want of an acceptance of the amended Enabling Act by the people of Montana, then they cannot be

granted under the laws in effect prior to its passage because those laws are subject to the same objection.

The next contention of defendants is that Chapter 122 is unconstitutional as being in conflict with Article XVII, sec. 1, of our Constitution which prohibits the disposition of state lands "unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state." Their contention is that under section 3 of Chapter 122 the legislature recognizes that a lease for as long as oil and gas is produced is worth more than a 20-year lease and has a value in excess of the agreed royalty payment since it gives to holders of leases for a 20-year term the right to exchange them for the type of lease provided in Chapter 122 upon payment of a sum "which is the full market value of the exchange, as determined" by the board of land commissioners.

There is, of course, no question but that a lease for as long as oil and gas is produced is more valuable than a 20-year lease. The point overlooked by defendants is that this value is taken into account at the time the bid is made for the lease.

It is the competitive bidding, pointed out in State ex rel. Dickgraber v. Sheridan, 126 Mont. 447, 254 Pac. (2d) 390, and as to this there was no disagreement among the members of this court, that brings to the state the market value of the lease. That a lease for such period as oil or gas is produced is worth more than a 20-year lease is conceded in this case.

In relator's petition it is alleged "that the failure and refusal of the defendant Land Board to offer a lease for oil and gas on state lands in the form and terms of said Chapter 122 * * * will result in a reduction in the amount of money that will be bid as first year rental for said leases by the representatives of such industry, and will reduce the amount of money that will be available for distribution to the school districts as a distributive share of the said interest and income fund for the fiscal year 1953-54." This allegation is admitted for the purpose of the demurrer. A few of the many cases declaring this to be the rule are: State ex

rel. Stuewe v. Hindson, 44 Mont. 429, 120 Pac. 485; Manley v. Harer, 73 Mont. 253, 235 Pac. 757; Mills v. Pope, 90 Mont. 569, 4 Pac. (2d) 485; Rhoades v. School District No. 9, 115 Mont. 352, 142 Pac. (2d) 890, 160 A. L. R. 1; Davis v. Park Securities Corp., 117 Mont. 393, 159 Pac. (2d) 323.

Defendants contend that the only way to obtain the actual market value of a lease after oil or gas is discovered is to have competitive bidding after the discovery of oil or gas. If this contention were sound, then the same objection, but in lesser degree, would lie against the 20-year lease in other words, a 20-year lease might be producing oil for nearly the full 20-year period, and in fact, all the oil or gas may be recovered within the 20-year period without ascertaining the value of the lease by competitive bidding after the discovery of oil or gas.

Such a conclusion would nullify all the leases heretofore issued and would make it impossible to lease lands for oil and gas purposes in the future because no one would bid for a lease knowing that upon the discovery of oil or gas it would be thrown open for competitive bidding. Only one well out of nine results in production, Bulletin, American Association of Petroleum Geologists, Vol. 37, No. 6, Table III, page 1193; hence those who embark upon such an undertaking know that it is speculative in character. This court has so recognized it. Steven v. Potlatch Oil & Refining Co., 80 Mont. 239, 260 Pac. 119. Notwithstanding its speculative and uncertain character, yet it has a market value. Montana R. Co., v. Warren, 6 Mont. 275, 12 Pac. 641.

In affirming the opinion in the Warren case, supra, the United States Supreme Court said: "That this mining claim, which may be called 'only a prospect,' had a value fairly denominated a 'market value,' may, as the Supreme Court of Montana well says, be affirmed from the fact that such prospects are the constant subject of barter and sale. Until there has been full exploiting of the vein, its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet uncertain and speculative as it is, such pros-

pect has a market value * * *.'' Montana R. Co v. Warren, 137 U. S. 348, 11 S. Ct. 96, 97, 34 L. Ed. 681.

Likewise this court has held that the requirements of obtaining the full market value are met by competitive bidding at the time the lease is issued. State ex rel. Robbins v. Bonner, ...... Mont. ......, 270 Pac. (2d) 400, 11 St. Rep. 215. If subsequently the lease obtains a greater value the lessee may not be compelled to pay more than the rental provided in the lease because that would not be a ''legitimate advantage'' but an ''illegitimate advantage.'' Rathbone v. State Board of Land Com'rs., 100 Mont. 109, 47 Pac. (2d) 47.

As well might it be contended that if the driller encounters a dry hole which eight out of nine are, then the state should reimburse him for the drilling expense. ''Market value'' is the amount that would be arrived at by fair negotiations between a willing seller and a willing buyer. Rider v. Cooney, 94 Mont. 295, 23 Pac. (2d) 261; United States v. Miller, 317 U. S. 369, 63 S. Ct. 276, 87 L. Ed. 336.

The Supreme Court of North Dakota has upheld a lease under the amended Enabling Act which was identical with that authorized by Chapter 122 as against the contention that it was unconstitutional. State ex rel. Rausch v. Amerada Petroleum Corp., 78 N. D. 247, 49 N. W. (2d) 14.

Defendants contend that under the Constitution the land board is a trustee for the sale and leasing of school lands. This contention is correct. Reasoning from there, they contend that while the legislature may make ''regulations and restrictions'', Art. XI, sec. 4, of the Montana Constitution, the board must administer the trust so as to obtain the largest measure of legitimate advantage to the state, and in any case principles of trust law should be applied and the trustee must use the same degree of prudence in the management of the trust as he would use in his own affairs. By the amendment to the Enabling Act, Congress provided how the trust shall be carried out. It provided that the leases may be ''for such term of years and on such conditions as may be from time to time provided by the legislatures.'' Chapter

122 was enacted pursuant to this authorization. It constitutes "regulations and restrictions as may be prescribed by law" within the meaning of Article XI, sec. 4, of our Constitution. Leuthold v. Brandjord, 100 Mont. 96, 47 Pac. (2d) 41.

As evidence of the fact that the trust will be prudently administered by executing leases under Chapter 122 is the fact that the United States has for some time been leasing its public lands on identical terms provided in Chapter 122, and individuals and corporations throughout the state have leased their own lands on the same terms and conditions as contained in Chapter 122. The standard of care required of a trustee is stated in 54 Am. Jur., Trusts, sec. 322, page 256, as follows: "Generally, the standard or measure of care, diligence, and skill required of a trustee in the administration of a trust is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances, and with a similar object in view."

I think the district court properly held that Chapter 122 is not unconstitutional and that it is in harmony with amended section 11 of the Enabling Act and that the judgment should be affirmed.